J-A25044-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

IN RE: L.A.S, A MINOR      :    IN THE SUPERIOR COURT OF
                                       :          PENNSYLVANIA
                                         :

APPEAL OF: T.S., FATHER      :
                                         :
                                         :
                                         :
                                         :
                                         :
                                         :      No. 727 WDA 2023

Appeal from the Order Entered May 23, 2023
In the Court of Common Pleas of Jefferson County Orphans' Court at
No(s):  10A-2023

BEFORE:   BOWES, J., KUNSELMAN, J., and COLINS, J.[*]

MEMORANDUM BY COLINS, J.:           **FILED: April 5, 2024**

     T.S. ("Father") appeals from the May 23, 2023 order of the orphans'
court terminating his parental rights to L.A.S., born in 2013 ("Child").  After
careful review, we affirm.

     Father and C.L. ("Mother," collectively "Parents") have a long history
with Jefferson County Children and Youth Services ("Agency") involving
numerous incidents dating back to 2007, but the present case began in April
2022 when Indiana County Children and Youth Services ("ICCYS") received a
report that Parents had violated a safety plan implemented by ICCYS that
Child should have no contact with her brother, T.S. ("Brother").  ICCYS had
previously found Brother, who was approximately 23 years old at the time of
the termination hearing, to be an indicated perpetrator of child abuse, based

_____

[*] Retired Senior Judge assigned to the Superior Court.

upon the sexual abuse of Child,[1] and reported the violation of the safety plan to the Agency. The Agency investigated and discovered that Brother remained living in the family home with Child.

As a result of the investigation, Child was removed on May 28, 2022, and placed in foster care. In June 2022, a family service plan was implemented requiring Parents to address mental health needs, improve parenting skills, ensure that Child has no contact with Brother, and maintain communication with the Agency. Parents were permitted visitation with Child in July 2022, but that visitation was suspended in September 2022. Following a permanency review hearing on December 5, 2022, Child's placement goal was changed to adoption. Parents submitted to clinical interviews with Dr. Carolyn Menta, a clinical psychologist, in January 2023, and Dr. Menta completed psychological assessments of Parents in March 2023.

On March 23, 2023, the Agency filed termination petitions as to Father and Mother's parental rights to Child. A hearing was held before the orphans' court on both petitions on May 9, 2023, at which Joanna Welch, an Agency caseworker, and Dr. Menta testified.[2]

---

[1] Under the Child Protective Services Law, an agency may find a report of child abuse to be "indicated," if after an investigation, the agency determines that there is substantial evidence of the alleged abuse. 23 Pa.C.S. § 6303(a).

[2] Child was represented in these proceedings by a guardian *ad litem* and separate legal interests counsel. **See In re Adoption of K.M.G.**, 240 A.3d 1218, 1235 (Pa. 2020) (appellate courts must engage in *sua sponte* review to determine if orphans' courts have appointed counsel to represent the legal interests of a child in a contested termination proceeding).

At the hearing, Welch testified that Parents had not been compliant with the family service plan that was put into place when Child was removed from the home in May 2022 and that services provided by the Agency have not been effective in remedying the conditions that led to Child's removal. N.T., 5/9/23, at 6-7, 9, 14. The family service plan required Parents to address their mental health needs, improve their parenting skills, ensure that Child have no contact with Brother, and maintain communication with the Agency. *Id.* at 6. Welch stated that Parents completed their psychological evaluations with Dr. Menta in January 2023, six months after they were ordered to do so, and as of the date of the hearing, they had not followed through with Dr. Menta's recommendations that they engage in trauma and couples therapy. *Id.* at 9, 13-14, 17, 31.

Welch stated that visitation between Parents and Child was halted in September 2022 due to the abuse investigation, and then in October 2022, Child's mental health providers further recommended that no visitation occur; the cessation in visitation continued as of the date of the termination hearing. *Id.* at 8-9, 15-16. Welch indicated that Parents have failed to provide Child with any resources, such as clothes or other support, since her removal. *Id.* at 13, 21. Welch testified that Parents had not completed their required parenting skills course, although this was due to the fact that this service requires observation of the parent's interaction with the child, which was halted in this case due to Child's disclosure of abuse. *Id.* at 9, 32.

Welch explained that Parents had failed to comply with the family service plan goal of maintaining regular contact with the Agency since the case opened. *Id.* at 7. She stated that Parents had only sporadically contacted the Agency or Child's foster parents to inquire about Child. *Id.* at 10, 13, 37. Similarly, while the Agency had been informed that Brother had moved out of the family home in early May 2023, that was based upon information provided by a service provider, rather than a firsthand report from either parent. *Id.* at 18-19, 27. Therefore, neither Welch nor any other representative of the Agency had been permitted to visit the property to verify that Brother was no longer residing there. *Id.* at 8, 22-23, 37-38. Separately, the Agency has been unable to access the family home to ensure that it was a safe and appropriate place for Child to live even though a large crack was visible in the roof of Parents' current residence, leading the Agency to have "significant concerns about [its] structural integrity." *Id.* at 7-8, 14, 28.

Notwithstanding Brother's apparent departure from the family home, Welch testified that the issue that led to Child's removal—Parents' lack of protective capacity of Child—continued to persist as of the date of the termination hearing. *Id.* at 9-10, 14, 32-33, 38-39. Welch further opined that Parents have failed to "recognize the harm" to Child that resulted from Brother's contact with Child in the past. *Id.* at 14. Welch noted that the issues related to Brother's abuse of Child existed "way before the filing of" the termination petitions or even Child's removal and therefore, Parents have long been on notice of the safety concerns related to Child. *Id.* at 28, 38-39. With

respect to Father, Welch testified that the Agency was concerned that during his interview with Dr. Menta, Father acknowledged that "something happened to" Child but did not connect this with Brother's actions. *Id.* at 20.

Welch testified that Child's foster parents, who had been caring for Child for approximately one year as of the date of the termination hearing, were ensuring Child's safety and meeting her physical, developmental, and emotional needs. *Id.* at 6-7, 10-11, 13. Welch stated that Child "is very settled and stable[]" and "doing very well" in the foster home and she has developed relationships with other children in her new neighborhood. *Id.* at 10, 32. Child has also begun to refer to her foster parents as "mom and dad." *Id.* at 11.

Welch explained that Child is attending school regularly and "doing the best that she can do" in school since her placement. *Id.* at 10-11. Child has an intellectual disability with secondary speech and language impairment, which was only diagnosed after she was removed from Parents, and she now has an individualized education plan at school that will ensure that her instruction is adapted to her capabilities. *Id.* at 11-12. Welch stated that, prior to Child's removal, she had instable housing—moving multiple times— and irregular school attendance. *Id.* at 12.

Welch testified that the foster parents have also ensured that Child attends regular counseling sessions to address her sexual assault trauma. *Id.* at 12. According to Welch, the therapy has been beneficial to Child, which has allowed her to recently step down in the frequency of her treatment. *Id.*

Welch stated that Child's "mental health has taken quite [some] time to unpack but we are starting to begin to see [Child] . . . make some forward progress in her trauma therapy." *Id.* Welch further testified that, although Child had expressed that she missed Parents to her mental health providers in November 2022, Child did not ask about Parents during Welch's more recent meetings with Child, including on the day before the termination hearing. *Id.* at 32. Welch further stated that Child had not asked about resuming visitation with Parents and she did not indicate a preference for reunification with Parents when asked. *Id.*

Dr. Menta, who was qualified as an expert in psychological testing, testified that she conducted a clinical interview of Father in January 2023 and prepared an assessment report of Father. *Id.* at 41-43; CYS Exhibit 2 at 1. She noted that Father had a "very significant mental health history" and was on medication for psychosis and schizophrenia. N.T., 5/9/23, at 48. Indeed, Father reported to Dr. Menta that he was hallucinating during the clinical interview. *Id.* Father also had a "significant history of trauma," suffering from sexual abuse as a child and neglectful parents. *Id.* at 49. Dr. Menta also reported that Father's answers to the personality surveys that he was asked to complete suggested that he was falsifying his answers to present himself in an unreasonably positive light. CYS Exhibit 2 at 7.

Dr. Menta stated that she had significant concerns regarding Father's abilities to set boundaries in family relationships. N.T., 5/9/23, at 48. Dr. Menta opined that Father was "internalizing" and "normalizing" his history of

trauma and sexual abuse "which really compromises his ability to set limits and boundaries and enforce those limits and boundaries in a protective manner." *Id.* at 49. She noted that Father acknowledged that Brother told him that he "did something while he was drunk and stupid" towards Child, but Father still was unsure whether any abuse had occurred. *Id.* at 48, 50. Father also informed Dr. Menta that, when Brother sexually abused Child's older sister, Father hit Brother and "put them in good touch, bad touch treatment." *Id.* at 50. Father also reported during his interview that, despite undertaking some efforts to keep Child apart from Brother, he was thinking about placing a trailer on his property for Brother and his partner. *Id.* at 49, 54-55.

Dr. Menta opined that Father suffered from schizophrenia, bipolar type 1, unspecified reaction to severe stress, and post-traumatic stress disorder. *Id.* at 49. Dr. Menta's recommendations for Father were to undergo therapy to address his traumatic personally history and further to participate in couples therapy with Mother. *Id.* at 49. She did not recommend reunification for Child "[b]ecause [Father's] protective capacity is not there." *Id.* at 51.

Following the hearing, on May 23, 2023, the orphans' court issued an order terminating Father's parental rights and a supporting opinion. On that same date, the court entered an order terminating Mother's parental rights.[3] Father filed a timely notice of appeal and concurrently filed a concise

---

[3] Mother also filed an appeal from the order terminating his parental rights, which is docketed at 726 WDA 2023.

statement of errors complained of on appeal, as required by Pa.R.A.P. 1925(a)(2)(i).

Father raises four issues on appeal:

1. Did the Court of Common Pleas abuse its discretion and commit a reversible error of law when it held that the statutory grounds for involuntary termination of Father's parental rights had been established pursuant to 23 Pa.C.S.[] § 2511(a)(1), by concluding that Father, for a period of at least six (6) months immediately preceding the filing of the petition for involuntary termination of parental rights, had failed or refused to perform parental duties?

2. Did the Court of Common Pleas abuse its discretion and commit a reversible error of law when it held that the statutory grounds for involuntary termination of Father's parental rights had been established pursuant to 23 Pa.C.S.[] § 2511(a)(2), by concluding that Father demonstrated a repeated and continued incapacity, abuse, neglect or refusal to parent?

3. Did the Court of Common Pleas abuse its discretion and commit a reversible error of law when it held that the statutory grounds for involuntary termination of Father's parental rights had been established pursuant to 23 Pa.C.S.[] § 2511(a)(5), by concluding that Father was incapable of remedying the conditions that necessitated the child's removal from his care?

4. Did the Court of Common Pleas abuse its discretion and commit reversible error of law when it held that terminating Father's parental rights would best serve the needs of the child where the child has expressed a desire for continued contact with her biological parents?

Father's Brief at 6-7 (suggested answers omitted).

In addressing these issues, we apply the following precepts:

The standard of review in termination of parental rights cases requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. A decision may be reversed for an abuse

of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In the Interest of J.R.R.*, 229 A.3d 8, 11 (Pa. Super. 2020) (quoting *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013)).

The burden is upon the petitioner to prove by clear and convincing evidence that the asserted grounds for seeking the termination of parental rights are valid. *In the Interest of L.W.*, 267 A.3d 517, 522 (Pa. Super. 2021). The clear and convincing evidence standard is defined as "testimony that is so clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act. "Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination[.]" *In re Adoption of C.M.*, 255 A.3d 343, 359 (Pa. 2021); *see* 23 Pa.C.S. § 2511(a)(1)-(11). If the orphans' court determines the petitioner established grounds for termination under Section 2511(a) by clear and convincing evidence, the court then must proceed to assess the petition under subsection (b), which focuses on the child's needs and welfare. *T.S.M.*, 71 A.3d at 267.

Here, the orphans' court terminated Father's parental rights pursuant to Sections 2511(a)(1), (2), and (5), and subsection (b).  However, this Court may affirm the court's decision to terminate if we agree with its determination concerning any one subsection of Section 2511(a), as well as Section 2511(b). *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).  We focus our analysis on Section 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
>     *         *         *
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
>     *         *         *
>
> **(b) Other considerations.**--The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child.  The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.  . . .

23 Pa.C.S. § 2511(a)(2), (b).

Under Section 2511(a)(2), "the moving party must prove by clear and convincing evidence that there is (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence;

and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re Adoption of L.A.K.*, 265 A.3d 580, 600 (Pa. 2021).

> [S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control[,] or subsistence necessary for his physical or mental well-being. Therefore, the language in subsection (a)(2) should not be read to compel courts to ignore a child's need for a stable home and strong, continuous parental ties, which the policy of restraint in state intervention is intended to protect. This is particularly so where disruption of the family has already occurred and there is no reasonable prospect for reuniting it.

*In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation and emphasis omitted).

The grounds for termination under Section 2511(a)(2) are not limited to affirmative misconduct, but also include refusal and parental incapacity that cannot be remedied. *Id.*; *In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *A.H.*, 247 A.3d at 443; *see also In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*), *affirmed*, 240 A.3d 1218 (Pa. 2020) (noting that a parent has an "affirmative duty" to work towards the return of her children, which requires, at a minimum, that she "cooperate with the Child and Youth Agencies and complete the rehabilitative services necessary so that the parent can perform [her] parental duties and responsibilities"). "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability

of services, may properly be rejected as untimely or disingenuous." **Z.P.**, 994 A.2d at 1118 (citation omitted). "[W]hen a parent has demonstrated a continued inability to conduct [her] life in a fashion that would provide a safe environment for a child, whether that child is living with the parent or not, and the behavior of the parent is irremediable as supported by clear and competent evidence, the termination of parental rights is justified." **Id.** (citation omitted).

Once a petitioner establishes adequate grounds for termination pursuant to Section 2511(a), the court turns to Section 2511(b), which requires that it "give primary consideration to the developmental, physical and emotional needs and welfare of the child." 23 Pa.C.S. § 2511(b). "The emotional needs and welfare of the child have been properly interpreted to include intangibles such as love, comfort, security, and stability." **T.S.M.**, 71 A.3d at 267 (citation and quotation marks omitted); **see also In the Interest of K.T.**, 296 A.3d 1085, 1106 (Pa. 2023). "Notably, courts should consider the matter from the child's perspective, placing her developmental, physical, and emotional needs and welfare above concerns for the parent." **K.T.**, 296 A.3d at 1105.

Our Supreme Court has consistently mandated that any Section 2511(b) analysis "requires consideration of the emotional bonds between the parent and child." **T.S.M.**, 71 A.3d at 267 (citing **In re E.M.**, 620 A.2d 481 (Pa. 1993)). Specifically, "[c]ourts must determine whether the trauma caused by breaking [the parent-child] bond is outweighed by the benefit of moving the

child toward a permanent home." *Id*. at 253 (cleaned up). The recognized threshold for this required bond inquiry is whether termination will sever a "necessary and beneficial relationship," causing the child to suffer "'extreme emotional consequences' or significant, irreparable harm." *K.T.*, 296 A.3d at 1109-10 (quoting *E.M.*, 620 A.2d at 484).

"[A] court conducting the Section 2511(b) needs and welfare analysis must consider more than proof of an adverse or detrimental impact from severance of the parental bond." *K.T.*, 296 A.3d at 1113. Our Supreme Court has explained that the court should consider, as appropriate, the child's need for permanency and length of time in foster care, the child's placement in a pre-adoptive home and whether there is a bond with the foster parents, and whether the foster home meets the child's developmental, physical, and emotional needs. *Id.* Nonetheless, there is no "exhaustive list" of factors that must be considered by an orphans' court in this context. *Id.* at 1113 n.28.

We first address the orphans' court's determination that termination was proper under Section 2511(a)(2). The orphans' court found that Brother's presence alone did not demonstrate Father's parental incapacity under Section 2511(a)(2) but that

> it was instead the mindset that prompted . . . Father to continue exposing [Child] to [Brother] even after [Father] knew or had reason to know that [Brother] had molested her. Brother's presence was merely emblematic of [Father's] inability to recognize an imminent danger and protect [his] daughter from it. "Parental incapacity," in this case, meant "lack of protective

- 13 -

capacity," and that was not alleviated by Brother moving to a different location [days prior to the termination hearing].

Orphans' Court Opinion, 5/23/23, at 6-7. The court explained that Father evinced parental incapacity based upon his "continual[] prioritiz[ation of his] adult son[, Brother,] over [his] minor daughter[, Child,] allowing [Brother] to live in [his] home, where he would have constant access to" Child. *Id.* at 7. While the court noted that Brother had recently left the home, this fact "did not mitigate" Father's failure to protect Child "because [he] *knew* Brother's departure was an absolute prerequisite to [Child] returning home." *Id.* at 8 (emphasis in original).

The orphans' court noted that although the Agency developed a family service plan to assist Father in developing his protective capacity and regain custody of Child, Father "continuously made decisions that distanced [him] farther and farther from reunification." *Id.* at 7. Father's failures included cutting off communication with the Agency, "stubbornly cho[osing] silence," even though "sever[ing] communication with" the Agency meant "sever[ing his] remaining avenue of access to" Child. *Id.* Father also failed to allow the Agency access to the family home to verify that it was safe and habitable for Child. *Id.* at 3.

The orphans' court recognized that Father did not have a "meaningful opportunity to seek the follow-up treatment Dr. Menta recommended" in her March 2023 report. *Id.* at 3. However, the court noted that the failure to receive recommendations from Dr. Menta was a consequence of Father's six-

month delay in scheduling the evaluation. *Id.* at 8. The court observed that the scheduling delay, as well as Father's lack of truthfulness during the evaluation, called into question Father's "willingness to do what was necessary to prove that [he] could *and* would do what was necessary to become [a] fit parent[] and regain custody of" Child." *Id.* (emphasis in original). The court concluded that, based upon Father's history, his mindset, and Dr. Menta's assessment, it was not expected that Father "will be able to remedy his . . . parental shortcomings any time soon." *Id.* "Even if [he] did," the court stated, "the journey toward rectifying the causes of [his] parental incapacity would leave [Child] without the hope of permanency for an unconscionable length of time." *Id.*

Father argues that, while he "may well have demonstrated some parental difficulties and parental shortcomings during the dependency matter[,]" the orphans' court's conclusion "that he has willfully failed to make progress on those shortcomings prior to the termination hearing ignores the record." Father's Brief at 19. Father asserts as evidence of his progress that Brother had obtained separate housing outside the family home and that Father had undergone a psychological evaluation. Father notes that he was not provided with Dr. Menta's recommendations until shortly prior to the hearing and thus could not act on them, yet he claims that he had engaged in mental health treatment of his own accord. Father notes that while he had not complied with the family service plan objectives, including completion of

a parenting skills course, this was because the Agency had ceased providing services to Parents in September 2022, rendering compliance impossible.

We conclude that the orphans' court's findings are supported by clear and convincing evidence and that the court did not err in determining that Father had a continuing parental incapacity to protect Child, that the incapacity caused Child to be without essential parental care, and that the cause of the incapacity cannot or would not be remedied. 23 Pa.C.S. § 2511(a)(2); **L.A.K.**, 265 A.3d at 600. There was ample testimony at the termination hearing establishing that Father lacked protective capacity to care for Child and that he was unable to remedy his parental incapacity. Dr. Menta opined, following a clinical interview and the preparation of a psychological assessment of Father, that he lacked the ability to protect Child. N.T., 5/9/23, at 41-43, 48-50; **see also** CYS Exhibit 2. Father questioned during his clinical interview whether what occurred between Child and Brother was abuse and he was still considering having Brother remain on his property at that time, leading Dr. Menta to opine that Father was "internalizing" and "normalizing" his history of trauma and sexual abuse, which hindered his ability to set and enforce boundaries with his children. N.T., 5/9/23, at 48-49, 50, 54-55. Dr. Menta thus concluded that she could not recommend Father's reunification with Child. **Id.** at 51.

Moreover, as the orphans' court stated, Father's interactions with the Agency reinforced that he was incapable of remedying his parental incapacity. While the Agency was made aware that Brother did move out of the family

home, he did not do so until after the termination petition was filed and just days prior to the hearing, and the Agency only found this information out through a third party. *Id.* at 8, 18-19, 22-23, 27, 37-38. This was illustrative of Father's general inability to maintain regular contact with the Agency: Father had only sporadically contacted the Agency and Child's foster parents, he did not provide Child with any resources during the course of the case, and he failed to provide the Agency with access to his home to ensure it was safe for Child. *Id.* at 7-8, 10, 13-14, 28, 37. Welch's interactions with Father led her to conclude that Father's lack of protective capacity of Child continued to persist as of the date of the termination hearing. *Id.* at 9-10, 14, 39.

Although Father contends that Brother's departure from the family home demonstrates that he had taken steps to remedy his parental incapacity, we find no abuse of discretion in the orphans' court's assessment that this action on the eve of the termination hearing and after the termination petition was filed did not mitigate Father's refusal to take this necessary step at any point before that date. Orphans' Court Opinion, 5/23/23, at 7-8; *see also Z.P.*, 994 A.2d at 1118 (noting that a parent's vow to cooperate after a long period of uncooperativeness may be rejected as untimely or disingenuous). Father also argues that he was prevented from fulfilling his obligations under the Agency's family service plan because services were cut off in September 2022. However, the record reveals only that visitation with Child was suspended in September 2022 due to an allegation of abuse and Parents' participation in a parenting skills course, which required an in-person observation component,

was correspondingly cut off at the same time, but the Agency continued to provide additional services, including those related to mental health, after September 2022. N.T., 5/9/23, at 8-9, 14, 17, 31-32.

Additionally, while Father contends that he could not comply with Dr. Menta's recommendation that he engage in couples and trauma therapy since he did not receive her report until shortly before the termination hearing, the record supports the orphans' court's finding that the delay in receiving the recommendations was only because Father waited six months to submit to the interview and testing after being ordered to do so. Orphans' Court Opinion, 5/23/23, at 8; N.T., 5/9/23, at 24-25, 31. We further note that, although Dr. Menta recognized that therapy could assist Father in developing healthier boundaries and protective capacity for Child, Dr. Menta also recognized that progress was not guaranteed and could require years to occur, which would be an unreasonable delay in Child achieving permanence and stability. N.T., 5/9/23, at 62-65; **see also In the Matter of M.P.**, 204 A.3d 976, 983 (Pa. Super. 2019) (stating that a child's life "cannot be held in abeyance" and her "need for permanence and stability" indefinitely subordinated to a parent's "attempts to attain the maturity necessary to assume parenting responsibilities") (citation omitted). Finally, while Father asserts that he had begun therapy on his own by the time of the termination hearing, there was no evidence submitted at the hearing to support this claim, and Welch denied that the Agency was in possession of any information showing that Father was engaged in therapy. N.T., 5/9/23, at 18, 20, 30.

We accordingly find that the Father's appellate claim with respect to Section 2511(a)(2) merits no relief. We thus shift our focus to the orphans' court's determination that termination was appropriate under Section 2511(b).

Father contends that "it would not be in the best interest of [C]hild to permanently sever the relationship with Father and terminate Father's parental rights." Father's Brief at 26. However, the bulk of the section of Father's brief devoted to Section 2511(b) relates to Father's alleged parental incapacities, the Agency's alleged failures in communication with Father, and Father's inability to comply with the Agency's requests of him due to the suspension of visitation and certain additional services. *Id.* at 23-26. We stress that the focus under subsection (b) is on the child's needs and welfare rather than the parent's or agency's actions. *See In the Interest of K.M.W.*, 238 A.3d 465, 475 (Pa. Super. 2020) (*en banc*); *In re C.B.*, 230 A.3d 341, 349 (Pa. Super. 2020). Nevertheless, we note that Father cites to Child's statement to her mental health care provider in November 2022 that she missed Parents and wanted Brother to move out so that she could return home, N.T., 5/9/23, at 26, and argues that the Agency "fail[ed] to incorporate [C]hild's wishes and desires into its permanency plan and reunification plan." Father's Brief at 24.

The orphans' court concluded that terminating Father's parental rights will not sever a necessary and beneficial bond that would cause Child to suffer detrimental consequences. Orphans' Court Opinion, 5/23/23, at 8-9. The

court noted that Child's life before her removal was "punctuated by chaos and instability," as a result of her "transient housing situation" and the "constant threat of abuse" that she faced because her caregivers did not protect her from Brother. *Id.* at 4. The court observed that Child "has grown up knowing that [P]arents will not keep her safe from Brother" and that this has "create[d] conflicting emotions and inflicts further harm" on her. *Id.* at 9. The court added that "[w]hether or not it was once her desire to return home," the evidence at the hearing demonstrated that the bond had diminished as Child had ceased asking the Agency caseworker about Parents and did not express a preference for reunification when she met with Welch the day before the termination hearing. *Id.* at 5, 9.

The orphans' court further noted that "[i]n all other respects, termination will only benefit" Child. *Id.* at 9. The court stated that the foster parents provide for Child's physical, emotional, and developmental needs and provide her a safe and settled home where she will not be in the presence of her abuser. *Id.* at 4-5, 9. Further, the foster parents capably ensure that Child is attending school according to an individualized plan, receiving trauma-based mental health therapy, and developing friendships within her new neighborhood. *Id.* The court indicated that the fact that Child refers to foster parents as "mom" and "dad" demonstrates that she feels safe and loved in their care and that they have assumed a primary place in her life. *Id.* at 5, 9. The court concluded that "[i]f Mother and Father's rights are terminated, [f]oster [p]arents can then adopt [Child], making her a permanent part of

their family and ensuring that she will continue to receive the care, love, and comfort she has received since becoming their foster daughter." *Id.* at 9.

Upon review, we conclude that the orphans' court did not abuse its discretion in determining that termination of Father's parental rights best served Child's needs and welfare under its Section 2511(b) analysis and that the court's findings are supported by clear and convincing evidence. While Father raises Child's statement to her mental health providers in November 2022 concerning her desire to live with Parents, it is clear that the orphans' court did consider this statement by Child. *See* Orphans' Court Opinion, 5/23/23, at 9. Nevertheless, the court appropriately relied on the testimony of Welch, the Agency caseworker, concerning Child's diminishing attachment to Parents over the course of the case in finding that the termination of Father's parental rights will not sever a necessary and beneficial relationship. *See In re Adoption of J.N.M.*, 177 A.3d 937, 944-45 (Pa. Super. 2018) (stating that a formal bonding evaluation is not required under subsection (b) and the orphans' court may rely on the opinion of the agency caseworker regarding the parent-child bond); *accord Z.P.*, 994 A.2d at 1121; *see also* N.T., 5/9/23, at 32. Furthermore, the court acted within its discretion in "prioritiz[ing] the safety and security needs of" Child over her bond with Father where there was ample evidence regarding Father's lack of protective capacity for Child. *Interest of M.E.*, 283 A.3d 820, 839 (Pa. Super. 2022); *see also L.W.*, 267 A.3d 517, 524; *J.N.M.*, 177 A.3d at 946.

Finally, we observe that the orphans' court's determination that foster parents were attending to Child's physical, emotional, and developmental needs, as well as ensuring that Child was regularly attending school and receiving trauma-based mental health therapy, is well-supported by the testimony at the termination hearing. N.T., 5/9/23, at 6-7, 10-12, 13, 32; *see K.T.*, 296 A.3d at 1113. We therefore find that Father's arguments with respect to Section 2511(b) merit no relief. Having rejected Father's challenges under both subsections of Section 2511 of the Adoption Act, we affirm the order terminating Father's parental rights to Child.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 04/05/2024